United States District Court
Southern District of Texas
**ENTERED**
October 25, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JACOB  MUSICH, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 2:18-CV-00258 |
| | § | |
| LORIE  DAVIS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND RECOMMENDATION**

Petitioner Jacob Musich is an inmate in the Texas Department of Criminal Justice - Correctional Institutions Division and is currently incarcerated at the Hughes Unit in Gatesville, Texas.  Proceeding *pro se*, Musich filed an original habeas corpus petition pursuant to 28 U.S.C. § 2254 on August 21, 2018.  (D.E. 1).  Musich challenges his convictions and sentences for aggravated kidnapping and aggravated sexual assault of a child, raising claims regarding his guilty plea, the trial court, and the performance of both trial and appellate counsel.  Respondent filed a motion for summary judgment, to which Musich has responded.  (D.E. 15, 19).  As discussed more fully below, it is respectfully recommended that Respondent's motion for summary judgment be granted and Musich's habeas corpus petition be dismissed in part and denied in part.  It is further recommended that a Certificate of Appealability ("COA") be denied.

## I.   JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is appropriate because Musich was convicted in Nueces County, Texas.  28 U.S.C. § 2254(a); 28 U.S.C. § 124(b)(6); *Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000).

## II.   BACKGROUND

### a.   Petition and Claims

In his § 2254 petition, Musich raises several claims regarding his guilty plea, the trial court, and the performance of both trial and appellate counsel.  (D.E. 1 at 6-12; D.E. 8 at 6-25).[1]  First, Musich argues that his guilty plea was unknowing and involuntary because, on the day of trial, counsel told Musich that he had rejected a plea deal because he thought the sentence would be lighter if Musich pleaded guilty before the jury and showed remorse.  (D.E. 1 at 6-7; D.E. 8 at 6-11).  Musich argues that he never saw the plea deal and was not given an opportunity to accept or reject it.  (D.E. 1 at 7).

Second, Musich argues that trial counsel was ineffective in numerous ways, including for: (1) failing to obtain a ruling that the victim's testimony was inadmissible because she was only 13 at the time of the trial; (2) failing to object to the trial court's severance of his two co-defendants; (3) failing to "propound interrogatories" following the indictment to determine whether a change of venue should be sought; (4) failing to request copies of communications between Musich, his mother, and jail personnel from December 2012 to September 2013, when the state filed its supplemental notice of extraneous offenses and bad acts; (5) failing to challenge the district attorney's "open

---

[1] All citations are to the electronic page number.

2

file" policy as insufficient to satisfy mandatory disclosures; (6) filing a blank application for probation that precluded Musich from being considered for probation; (7) saying Musich was "obviously guilty" during his closing argument; (8) failing to request indigent funds from the trial court to obtain an expert witness regarding whether a life sentence was necessary; (9) failing to obtain funds to hire a DNA expert to refute the state's DNA expert; (10) failing to have a sanity or competency evaluation on Musich given that he was depressed, delusional, and unable to assist counsel; and (11) failing to have Dr. Alonzo meet with Musich before trial to better prepare her to testify on his behalf.  (*Id.* at 6, 9-10; D.E. 8 at 11-20).

Third, Musich argues that the trial court violated his Fifth and Fourteenth Amendment rights by allowing co-counsel Virginia Koblizek Burt to withdraw as appellate counsel after she accepted payment to represent him on direct appeal.  (D.E. 1 at 11-12; D.E. 8 at 20-23).   Finally, Musich contends that appellate counsel was ineffective because he did not raise a claim regarding the state's comment during closing arguments that the victim would not be able to wear a white wedding dress.  (D.E. 1 at 11; D.E. 8 at 23-25).

### b.    State Court Records

On March 14, 2013, Musich and co-defendants Eric Dimick and Colton Visor were charged in an indictment with one count of aggravated kidnapping and one count of aggravated sexual assault of a child.  (D.E. 16-2 at 7-8).

After a jury was selected and at the beginning of the trial, Musich pleaded guilty. (D.E. 16-6 at 6-7).  Musich signed and submitted a judicial confession in which he stated

3

that his attorney had investigated the facts and circumstances surrounding his case, discussed them with Musich, and advised him of possible defenses.  (D.E. 16-10 at 15). He also stated that his plea was freely, voluntarily, knowingly, and intelligently given and that he waived his right against self-incrimination.  (*Id.*).  The jury found him guilty. (D.E. 16-6 at 14).

At the punishment phase of the trial, Corpus Christi Police Detective Eddie Alvarado testified that Musich and his co-defendants were arrested following a tip by a third party.  (*Id.* at 64-65).  Alvarado interviewed all three suspects, but only Musich confessed to participating in the kidnapping and sexual assault.  (*Id.* at 65-66).  Musich's account of the crimes aligned with statements by the victim and her brother.  (*Id.* at 66). Musich was the only one who raped the victim.  (*Id.* at 84-85).

Carol McLaughlin, a forensic nurse at a children's hospital, testified that she examined the victim on the night of the kidnapping and sexual assault.  (*Id.* at 113). While taking her history, the victim indicated that she was kidnapped while she was riding her brother's bike and pulled into a vehicle by three men.  (*Id.* at 114).[2]  While inside, one of the men "put some kind of gel on [her] private part," "put his thing on [her] butt," and "put his thing in [her], in [her] private," which "hurt very much."  (*Id.*).  They drove her to the sand dunes and left her, but she found her way to the street and borrowed a phone to call her parents.  (*Id.* at 114-15).  After taking the history, McLaughlin conducted a physical examination of the victim, who was 11 years old and just beginning

---

[2] McLaughlin recounted this history from the report she prepared at the time, which is also in the record.  (D.E. 16-10 at 45-50).

puberty.  (*Id.* at 116).  McLaughlin saw no injuries on the victim's body, but there were stains on her shirt.  (*Id.* at 117).  She collected all of the victim's clothes for further testing.  McLaughlin then conducted a genital examination.  (*Id.*).  The victim was not physically ready for the tools used during a genital examination of an adult woman, but McLaughlin's examination found three red bruises on her hymen, which was consistent with the victim's account of what happened.  (*Id.* at 118-19).  In addition to the clothing, McLaughlin collected hair combings, a venous sample for DNA, a vaginal swab, and an external anal swab.  (*Id.* at 119).

Lisa Baylor, a forensic scientist for the Texas Department of Public Safety ("DPS") in Corpus Christi, testified that her laboratory conducted DNA analysis using a process called PCR.  (*Id.* at 126).  She conducted tests on each of the items provided by McLaughlin, along with several samples taken from the inside of Musich's vehicle and samples taken from each of the three defendants.  (*Id.* at 129-30, 133).  The PCR test was limited in cases where a DNA mixture was found, however, and there was not enough information to determine who one of the contributing parties was.  (*Id.* at 136).  When this occurred, Baylor sent the samples to a different DPS laboratory that conducted DNA analysis using a process called Y-Str.  (*Id.* at 137).  All three co-defendants were excluded as contributors to the DNA mixture found on the external rectal swab and the victim's underwear using the PCR test, but the samples were also sent to the other laboratory for Y-Str testing.  (*Id.* at 138-40; D.E. 16-10 at 55-59).

Heather Dragna, a forensic scientist for the DPS in Austin, testified that she performed a Y-Str analysis on the items sent from the Corpus Christi laboratory.  (D.E.

16-6 at 144).   Musich could not be excluded as the contributor of the DNA on the external rectal swab.  (*Id.* at 145-46; D.E. 16-10 at 60-61).

The victim, referred to by the pseudonym Lee Haley, testified that she was 11 years old and in sixth grade.  (D.E. 16-7 at 29).  She had bad anxiety and was afraid to go to her friends' houses or to be alone.  (*Id.* at 31-32).  She was afraid that she would be unable to be independent if Musich was ever released.  (*Id.* at 32).

Musich presented testimony from Dr. Joy Alonzo, a registered pharmacist and professor at the University of Houston.  (D.E. 16-9 at 5).  Alonzo conducted research on "synthetic marijuana," which Musich regularly used around the time of the offense.  (*Id.* at 6).  She testified to the attributes of synthetic marijuana as a class of drugs, the effect such drugs could have on users, and the attempts to legally outlaw the drugs.  (*Id.* at 7-17).  Alonzo had not met Musich and did not know what specific type of synthetic marijuana he was using.  (*Id.* at 18).

The state re-called Detective Alvarado, who testified that Musich was recorded on jail phone calls with his mother as saying that he needed to be reminded why he was in jail and he had no self-control.  (*Id.* at 60-61).  When referring to the victim's brother, Musich referred to him as the "little kid that ran like a little girl."  (*Id.* at 61).  The state also played a recording of the entirety of the calls, but the recording was not transcribed. (*Id.* at 60).

During closing arguments, the state replayed one of Musich's calls from jail in which he, referring to the victim, said: "The little girl is dumb as fuck."  (*Id.* at 89).  Later during closing arguments, the state told the jury to "start at life and you think of that little

6

girl on her wedding day, whether or not she will feel good enough and pure enough to wear a white wedding dress, or if they stole that from her too." (*Id.* at 96). After the conclusion of closing arguments, Musich objected only to comments made by the state regarding his race. (*Id.* at 100-02).

The jury returned a sentence of 99 years' imprisonment for the aggravated kidnapping and life imprisonment for the aggravated sexual assault of a child. (*Id.* at 103-04). The court subsequently imposed this sentence. (*Id.* at 106).

Musich's lead counsel, Mark Woerner, subsequently moved to withdraw. (D.E. 16-2 at 158). The court granted his motion and appointed Burt, who was co-counsel during trial, to represent Musich on appeal. (*Id.* at 160-61). Burt then moved to withdraw as appellate counsel because Musich raised concerns about Woerner's trial performance and Burt was part of the trial team. (D.E. 16-3 at 4-5). The court granted Burt's motion and appointed new counsel. (*Id.* at 6-7).

On direct appeal to the Texas Thirteenth District Court of Appeals, Musich raised a single argument regarding the state's closing argument, focusing on the references to his race and the use of cursing. (D.E. 16-11 at 10-16). The court affirmed Musich's sentence because counsel did not object or move for a mistrial until after closing arguments were complete and Musich had not shown fundamental error. (D.E. 16-17 at 4-6). Musich then filed a petition for discretionary review ("PDR") with the Texas Court of Criminal Appeals ("TCCA") raising the same argument. (D.E. 16-22 at 9-14). The TCCA refused the petition. (D.E. 16-18 at 6).

Following the refusal of his PDR, Musich filed an application for a writ of habeas corpus in state court under Article 11.07 of the Texas Code of Criminal Procedure. (D.E. 16-28 at 4-20). In his Article 11.07 application, Musich raised claims that: (1) his guilty plea was not knowing and voluntary because counsel rejected the state's plea offer without his knowledge and changed trial strategies on the day of trial; (2) trial counsel was ineffective for each of the reasons Musich now raises in his § 2254 petition; (3) the trial court erred and abused its discretion when it allowed Burt to withdraw as appellate counsel because there was no conflict of interest and courts often appointed co-counsel to represent a convicted defendant on appeal; and (4) appellate counsel was ineffective "for failing to present in the Appellant's Brief issues concerning improper comments made by the prosecution at trial." (*Id.* at 9-17).

The state first responded that Musich's guilty plea was knowing and voluntary because, based on an affidavit from Woerner, he had been informed of the 40-year plea deal and rejected it in favor of the strategy of pleading guilty before the jury. (*Id.* at 48-51). Similarly, as to the ineffective-assistance claims, the state responded that Woerner's affidavit countered each of Musich's claims and that Musich could not show by a preponderance of the evidence that his performance fell below an objective level of reasonableness. (*Id.* at 52-56). Third, as to whether the trial court erred in allowing Burt to withdraw as appellate counsel, the state argued that the court appointed other counsel and Musich failed to show this was an abuse of discretion. (*Id.* at 57-58). Finally, as to improper comments during the state's closing argument, the state argued that Musich had not identified which comments he believed to be improper. (*Id.* at 58-60).

Woerner stated the following in an affidavit.  (*Id.* at 68-83).  He fully informed Musich of the state's plea offer and made several attempts to obtain a 30-year offer, which was offered to his co-defendants.  (*Id.* at 70-71).  Woerner discussed the 40-year offer with Musich on several occasions, but his mother thought it was too long and did not accept the explanation that his co-defendants received 30-year deals because they were not accused of committing the sexual assault.  (*Id.* at 71).  Woerner strongly recommended that Musich take the final 40-year offer, but Musich rejected it.  (*Id.*). Moreover, Musich agreed with the strategy to enter a guilty plea to the jury and utilize his remorse to establish that his actions were out of character and partially caused by his use of synthetic marijuana.  (*Id.* at 72).  This was not a last-minute strategy and also involved picking a jury consisting primarily of women who had raised sons.  (*Id.*).  However, it was undermined by recorded conversations that Musich had with his mother over the jail phone in which they discussed trial strategy and the facts of the case in a way that made Musich unsympathetic, even though Woerner had told them that the jail would record their calls.  (*Id.* at 72-73).

Woerner further stated that: (1) there was no basis to exclude the testimony of the victim, who was clearly competent; (2) there was no legal basis to challenge the severance of Musich from his co-defendants given that he confessed and they did not; (3) Musich agreed with the strategy of pleading guilty before the jury; (4) it was clear during the jury selection process that a change of venue was unnecessary; (5) he did receive copies of letters written by Musich and phone recordings, but many of the damaging phone conversations were close in time to the trial; (6) he received all relevant

9

discovery; (7) the application for probation was legally sufficient, and probation was unrealistic regardless; (8) the trial strategy was always for Musich to plead guilty and seek a lower sentence based on his remorse; (9) an expert was retained to examine Musich, but Woerner concluded that his testimony would be damaging; (10) there was DNA evidence linking Musich to the sexual assault that excluded his co-defendants, in addition to the fact that Musich confessed and the trial strategy was to plead guilty; (11) a psychologist examined Musich and concluded that he was competent to stand trial; and (12) Alonzo was retained to testify about the general effects of synthetic marijuana and meeting Musich would not have contributed anything to the defense.  (*Id.* at 76-82).

Burt stated the following in an affidavit.  (*Id.* at 84).  She assisted Woerner in Musich's trial.  She discussed the trial tactics and advantages of pleading guilty with Musich's mother, who was fully informed of Woerner's strategy and aware of the evidence against Musich.  Everyone agreed that the best trial strategy was to plead guilty and show remorse for the crimes.  Trial counsel fully investigated all of the evidence in the case and properly prepared all witnesses.  Musich and his mother were aware of the plea agreement offered by the state and agreed to move forward with a jury trial on punishment.  (*Id.*).

Dr. Troy Martinez indicated that he conducted a psychological evaluation of Musich after being referred by Woerner.  (*Id.* at 85).  Although he wrote a report detailing Musich's history of drug abuse and the effect it may have had on his actions, he also told Woerner that he was equally concerned about the potential impact of damaging

testimony he might give on cross-examination given the facts and circumstances of this case.  (*Id.*).

The state trial court recommended that Musich's Rule 11.07 application be denied, concluding that "the assertions in the State's original answer are correct."  (*Id.* at 87).[3] The trial court concluded that Musich had failed to show that trial or appellate counsel performed deficiently or that he was prejudiced by their actions, nor had he shown entitlement to relief on his other claims.  (*Id.*).  The TCCA denied the Rule 11.07 application without a written order.  (D.E. 16-27 at 1).

## III.  DISCUSSION

In the motion for summary judgment, Respondent first argues that Musich's fourth claim is unexhausted and procedurally barred because he did not raise an argument about the state's "white wedding dress" statement in his PDR or Rule 11.07 application before the state court.  (D.E. 15 at 6-8).  Further, Respondent argues that Musich cannot raise this claim in state court now due to Texas's abuse-of-the-writ doctrine.  (*Id.* at 8-9). Second, Respondent contends that Musich's guilty plea was knowing, intelligent, and voluntary because he acknowledged as much at the time and attested that his attorney had discussed the facts and circumstances surrounding the case with him.  (*Id.* at 14-15). Moreover, Respondent argues that counsel's actions did not render Musich's plea involuntary and that the state court's credibility choice in favor of counsel's recounting of

---

[3] The copy of the trial court's recommendation in the record is not signed or dated. However, it is consistent with the TCCA's subsequent denial of Musich's Rule 11.07 application, and neither party has raised an argument regarding the contents of the trial court's order.

what happened is presumptively correct.  (*Id.* at 15-18).  Respondent asserts that, because the plea was voluntary, Musich waived any other claims regarding counsel's conduct before the plea.  (*Id.* at 18-19).  Third, Respondent contends that Musich's trial counsel was not ineffective because Musich cannot overcome the strong presumption, based on the state court's conclusions, that trial counsel rendered adequate assistance.  (*Id.* at 24-27).  Finally, Respondent argues that the trial court did not err in granting Burt's motion to withdraw as appellate counsel because Musich was represented by counsel on appeal and provides no support for his claim that Burt accepted payment and did not return such fees.  (*Id.* at 28-30).

Musich initially responds that the state court's determination is not entitled to deference because it never made a substantive ruling on the merits.  (D.E. 19 at 15).  On the merits, he first argues that his guilty plea was unknowing and involuntary due to counsel's limited discussion of the available plea bargain.  (*Id.* at 16).  He argues that he would have accepted the 40-year plea deal had counsel given him the opportunity and that counsel's affidavit is false.  (*Id.* at 19-23; D.E. 19-1 at 6-10).  Finally, Musich argues that counsel was ineffective for failing to obtain a DNA expert who could have explained the testing process in general terms for the jury and addressed the fact that the state's expert testified at a co-defendant's trial that none of the three defendants matched the DNA found in the rape kit.  (D.E. 19 at 23-25; D.E. 19-1 at 4-6).  Musich relies on his previously raised arguments for all other issues.  (D.E. 19-1 at 10).

### a.  Exhaustion

Under the applicable federal law, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that … the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  Thus, a petitioner "must exhaust all available state remedies before he may obtain federal habeas corpus relief."  *Sones v. Hargett*, 61 F.3d 410, 414 (5th Cir. 1995).  A petitioner must "fairly present" the substance of his claim to the state court.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  He must raise the same claim in federal court that he raised in state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971).  A claim is not exhausted if the petitioner presents new legal theories or factual claims in his federal petition.  *Neville v. Dretke*, 423 F.3d 474, 478 (5th Cir. 2005).

The exhaustion requirement is not jurisdictional.  *Morris v. Dretke*, 413 F.3d 484, 490-91 (5th Cir. 2005).  Nonetheless, a petitioner's failure to comply with the exhaustion requirement precludes federal court review of his claims.  *Deters v. Collins*, 985 F.2d 789, 797 (5th Cir. 1993).  Exceptions exist only where there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant.  28 U.S.C. § 2254(b)(1)(B).  A Texas petitioner may exhaust his state court remedies by filing either a petition for discretionary review or an application for habeas corpus relief with the TCCA.  *Myers v. Collins*, 919 F.2d 1074, 1076 (5th Cir. 1990).

A procedural default occurs where a petitioner has failed to exhaust state remedies and the state court would now find the claim procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). Under these circumstances, a federal court need not dismiss the claims to allow exhaustion. *Rocha v. Thaler*, 619 F.3d 387, 398 (5th Cir. 2010). Under Texas law, a court may not consider the merits of a subsequent application for a writ of habeas corpus unless the petitioner establishes: (a) that the new claims could not have been presented in a timely initial application or a previously filed application because the factual or legal basis was unavailable at that time; or (b) but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt. Tex. Code Crim. P. art. 11.07, sec. 4(a). Even if a claim is procedurally defaulted, a federal court may consider the merits if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or show that a miscarriage of justice would result from the failure to consider the claim. *Coleman*, 501 U.S. at 750.

Here, Musich has failed to exhaust his claim that appellate counsel rendered ineffective assistance of counsel because he did not raise a claim regarding the state's comment during closing arguments that the victim would not be able to wear a white wedding dress. In his PDR, Musich raised a claim regarding other comments that the state made during closing arguments, but did not mention the wedding dress comment. (D.E. 16-22 at 9-14). In his Rule 11.07 application, Musich vaguely argued that the state made improper comments during closing arguments, but did not identify any specific comments. (D.E. 16-28 at 17). In neither the PDR nor the Rule 11.07 application did

Musich fairly present the substance of his present claim, and the state court never had an opportunity to rule on the wedding dress comment. *Anderson*, 459 U.S. at 6; *Neville*, 423 F.3d at 478.

Moreover, Musich's claim is procedurally defaulted because the state court would now find it procedurally barred if he attempted to raise it. *See* Tex. Code Crim. P. art. 11.07, sec. 4(a). Musich cannot overcome this default because he has not made any showing of cause or prejudice for the default, nor has he established that a miscarriage of justice would result from the failure to consider the merits of his claim. *Coleman*, 501 U.S. at 750.

### b.    Merits

### 1. Standard of Review

A § 2254 petition raising claims that were adjudicated on the merits in state court may not be granted unless the adjudication of the claim: (a) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (b) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decides a case differently than the Court on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Although "unreasonable" is difficult to define, the Supreme Court noted that it is an objective, rather than subjective, standard and emphasized that there is a critical difference between an unreasonable application of federal law and a merely "incorrect" or "erroneous" application of federal law. *Neal v. Puckett*, 239 F.3d 683, 687 (5th Cir. 2001).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). This is a difficult standard to meet. *Id.* at 102-03.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. Even summary rulings by state courts are afforded deference under § 2254(d), and in such cases, the relevant question is what arguments or theories could have supported the state court's decision. *Id.* at 99, 102. Review under § 2254(d)(1) is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

If a decision by a state court is silent as to the reasons for the refusal, a federal habeas court can "look through" the decision and evaluate the last reasoned state court decision. *Bledsue v. Johnson*, 188 F.3d 250, 256 (5th Cir. 1999). A state court's factual findings are presumed to be correct and a petitioner has the burden of rebutting the presumption with clear and convincing evidence. *Garcia v. Quarterman*, 454 F.3d 441,

16

444 (5th Cir. 2006).  This deference extends not only to express findings of fact, but to the implicit findings of the state court.  *Id.*  In addition, "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Harrington*, 562 U.S. at 98.

### 2. Guilty Plea and Ineffective Assistance Before Trial

To prevail on an ineffective assistance of counsel claim, a petitioner must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  He must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. *Id.* at 687-88.

Judicial scrutiny of counsel's performance must be highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  A court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  *Id.* at 690.

To show prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 695. In the context of a guilty plea, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Federal court review of a state court's denial of an ineffective-assistance claim is "doubly deferential" because the court must give deference both to counsel's performance and to the state court's conclusion. *Cullen*, 563 U.S. at 190. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

"A federal court will uphold a guilty plea challenged in a habeas corpus proceeding if the plea was knowing, voluntary, and intelligent." *James v. Cain*, 56 F.3d 662, 666 (5th Cir. 1995). A guilty plea is invalid if the defendant does not understand the constitutional protections that he is giving up or where his understanding of the charges is so incomplete that his plea cannot signify an admission of guilt. *Id.* If the record shows that the defendant understood the charge and consequences, then the guilty plea will be upheld as voluntary even if the trial court did not explain the offense. *Id.* If the

18

defendant understands the length of sentence he might possibly receive, then he understands the consequences of his plea. *Id.* He need not be informed of every right that is waived by a guilty plea or all of the consequences that flow from his conviction and sentence. *United States v. Edwards*, 911 F.2d 1031, 1035 (5th Cir. 1990). "Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

When a defendant knowingly and voluntarily enters a guilty plea, he is precluded from later challenging the deprivation of rights that occurred prior to the entry of the guilty plea. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).

Here, Musich has not met his burden to show that the state court's denial of his claim that his guilty plea was not knowing and voluntary was contrary to, or an unreasonable application of, federal law or an unreasonable determination of the facts. In denying this claim, the state court implicitly made a credibility determination in Woerner's favor, and that determination is presumptively correct. *Garcia*, 454 F.3d at 444 (stating that the presumption of correctness applies equally to implicit factual findings). Based on Woerner's affidavit, he discussed the potential 40-year plea deal with Musich and his family on several occasions, but they rejected it in favor of the ultimate trial strategy of pleading guilty before the jury and seeking a lower sentence based on Musich's remorse. (D.E. 16-28 at 70-72). Woerner's account of the facts was also supported by co-counsel Burt's affidavit. (*Id.* at 84). In order to overcome the

presumption in favor of the state court's factual findings, Musich carries the burden of rebutting this account with clear and convincing evidence, which he has not done. *Garcia*, 454 F.3d at 444.   Beyond his own verified Rule 11.07 application, Musich provided no evidence rebutting Woerner's affidavit.

Moreover, Musich's statements in open court "carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74.   At trial, Musich pleaded guilty.  (D.E. 16-6 at 6-7). He also signed and submitted a sworn judicial confession in which he pleaded guilty to the offenses, acknowledged that he had discussed the facts and circumstances surrounding his case with counsel, stated that he was satisfied with counsel's representation, and waived his right against self-incrimination.   (D.E. 16-10 at 15). Although Musich alleges that counsel made a last-minute strategy change to plead guilty rather than contesting guilt at trial, he has not alleged that he was in any way coerced or threatened into pleading guilty.  (*See* D.E. 1 at 6-8; D.E. 8 at 6-11).  Based on the state court's presumptively correct construction of the facts and the evidence in the record, Musich understood the charge and the consequences of pleading guilty, and his guilty plea was accordingly knowing and voluntary.  *James*, 56 F.3d at 666.

Because Musich's guilty plea was knowing and voluntary, he is precluded from raising his ineffective-assistance claims regarding pre-plea issues, including his claims that counsel was ineffective for: (1) failing to object to the severance of his co-defendants; (2) failing to "propound interrogatories" to determine whether a change of venue should be sought; (3) failing to challenge the district attorney's "open file" policy as insufficient to satisfy mandatory disclosure; and (4) filing a blank application for

probation. *Tollett*, 411 U.S. at 267.  Moreover, even if Musich could raise these claims, he has not established that he was prejudiced by counsel's actions because he has not explained or shown how the outcome of the trial would have been different but for counsel's actions. *See Strickland*, 466 U.S. at 695.

### 3.    Ineffective Assistance at Trial

Several of Musich's ineffective-assistance claims relate to the punishment phase of his trial, however, and thus were not waived by his guilty plea.  These claims include that counsel was ineffective for: (1) failing to obtain a ruling that the victim's testimony was inadmissible because she was only 13 at the time of trial; (2) failing to request copies of communications between Musich, his mother, and jail personnel from December 2012 to September 2013; (3) saying Musich was "obviously guilty" during closing arguments; (4) failing to request indigent funds from the trial court to obtain an expert witness regarding whether a life sentence was necessary; (5) failing to obtain funds to hire a DNA expert; (6) failing to have a sanity or competency evaluation on Musich; and (7) failing to have Dr. Alonzo meet with Musich before her testimony.  As to each of these claims, Musich has failed to show that the state court's application of the *Strickland* standard was contrary to, or an unreasonable application of, federal law or an unreasonable determination of the facts.

First, Musich has provided no factual or legal support, beyond his own statements, for his claims that the victim's testimony was inadmissible or that counsel should have conducted  a sanity or competency evaluation on him.  Because there is nothing in the record to support these claims, Musich has not met his burden to show that the state

court's denial of them was contrary to, or an unreasonable application of, federal law or an unreasonable determination of the facts.  Similarly, review of the transcripts indicates that counsel did not state that Musich was "obviously guilty" during closing arguments, but regardless, Musich has not shown how he would have been prejudiced by this comment given that he pleaded guilty to the offenses.  (*See generally* D.E. 16-9 at 74-86).

Second, as to Musich's two claims regarding obtaining expert witnesses, the record does not support his claims.  As to obtaining an expert regarding whether a life sentence was necessary, counsel indicated in his affidavit that he did obtain an expert to examine Musich, but opted not to present his testimony because it would have hurt Musich.  (D.E. 16-28 at 81).  This expert, Dr. Martinez, also stated as much in a letter. (*Id.* at 85).  As to obtaining a DNA expert, Musich's claim is based on his contention that the state's DNA expert testified at his co-defendant's trial that there was no DNA evidence linking any of the defendants to the sexual assault offense.   However, the transcript excerpt Musich submitted is not inconsistent with the testimony at his own trial or the DNA reports the state submitted.  (*See* D.E. 16-6 at 138-40, 144-46; D.E. 16-10 at 55-61).  At Musich's trial, Baylor, the DPS forensic scientist in Corpus Christi, indicated that her testing could not connect any of the defendants to the offense, but that further testing using a different process could be conducted at a different DPS lab in Austin. (D.E. 16-6 at 136, 138-40).  Dragna, the DPS scientist from Austin, testified that testing using the Y-Str process could not exclude Musich as a DNA contributor.  (*Id.* at 144). Regardless, even if counsel's failure to obtain a DNA expert was deficient, Musich has

22

not shown how he was prejudiced where he also confessed to committing the sexual assault. (*See id.* at 64-66).

Third, counsel stated in his affidavit that he received records of the communications between Musich and his mother while Musich was in jail. (D.E. 16-28 at 78). Musich has not identified any specific communications that he contends counsel did not receive, nor has he contested counsel's statements that he repeatedly warned Musich and his mother not to discuss the case over the jail phone. (*See id.*). The record shows that counsel filed a pretrial motion *in limine* to exclude references to jail communications, which does not support Musich's contention that counsel was unaware of the communications or their contents. (*See* D.E. 16-2 at 72-73). Accordingly, Musich has not shown that counsel's actions regarding the jail communications were outside the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Finally, Dr. Alonzo's testimony centered on the effects of synthetic marijuana generally, not about the effects synthetic marijuana had on Musich at the time of the offense. (D.E. 16-9 at 7-17). Given the context of Dr. Alonzo's testimony, Musich has not shown that he was prejudiced by counsel's failure to arrange a meeting between the two.

Because Musich has not shown that counsel's actions were both deficient and that he was prejudiced by them, he also has not met the higher burden to show that the state court's denial of his claims was contrary to, or an unreasonable application of, federal law or an unreasonable determination of the facts. *Cullen*, 563 U.S. at 190 (stating that federal court review of a state court's denial of an ineffective-assistance claim is "doubly deferential").

23

4.        **Trial Court Error**

Typically, the Sixth Amendment guarantees criminal defendants the right to representation by counsel of their choice.  *See Powell v. Alabama*, 287 U.S. 45, 53 (1932).  However, this right does not extend to defendants who require counsel to be appointed for them.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).  The right to court-appointed counsel guarantees adequate representation, not representation by a particular attorney.  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989).  Further, "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."  *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983).

Here, Musich has not established that the state court's denial of his claim regarding the withdrawal of Burt as appellate counsel was contrary to, or an unreasonable application of, federal law or an unreasonable determination of the facts.  First, Burt's motion to withdraw was proper because she was co-counsel at trial and Musich, as evidenced by each of his post-conviction filings, had issues he sought to raise regarding counsel's trial strategy and performance.  Second, the trial court did not violate Musich's Sixth Amendment right to appellate counsel because it appointed  counsel after it granted Burt's motion to withdraw.  (D.E. 16-3 at 7).  The Sixth Amendment guarantees only competent appointed counsel, not appointed counsel of a defendant's choice.  *Caplin*, 491 U.S. at 624.  Finally, there is no evidence in the record regarding Musich's claim that

24

Burt withdrew only after receiving payment and never returned those funds, and this court cannot consider Musich's bald assertions to be evidence. *Ross*, 694 F.2d at 1011.

## IV.   CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A).   Although Musich has not yet filed a notice of appeal, the issue of whether he is entitled to a COA will be addressed. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (stating that a district court may *sua sponte* rule on a COA).

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Where a district court rejects the constitutional claims on the merits, the petitioner must show that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. Daniel*, 529 U.S. 473, 484 (2000).   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.   Where a claim is dismissed on a procedural ground, a petitioner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason

would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Here, it is recommended that some claims be dismissed on procedural grounds and some on the merits. Reasonable jurists would not find it debatable that Musich's claim regarding the state's closing argument is unexhausted and procedurally barred. Nor would jurists of reason debate denial of habeas relief on the merits of the remaining claims. Therefore it is further recommended that any request for a COA be denied.

## V.   RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Respondent's motion for summary judgment (D.E. 15) be GRANTED and Musich's § 2254 petition be DENIED in part and DISMISSED in part as unexhausted and procedurally barred. In addition, it is further recommended that any request for a Certificate of Appealability be DENIED.

Respectfully submitted this 25th day of October, 2019.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).